304 F.2d 786
 SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
Herbert RAPP, individually and doing business under the firm name and style Webster Securities Company, a sole proprietorship, and Benjamin Shuman, Appellees.
 No. 313.
 Docket 27278.
 United States Court of Appeals Second Circuit.
 Argued May 8, 1962.
 Decided June 21, 1962.
 
 David Ferber, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Peter A. Dammann, Gen. Counsel, Faith Colish, Atty., Securities and Exchange Commission, Washington, D. C., Andrew N. Grass, Jr., and David W. Smith, Attys., Securities and Exchange Commission, New York City, on the brief), for appellant.
 Howard B. Gliedman, New York City (Frances Thaddeus Wolff, New York City, on the brief), for appellees.
 Before CLARK, KAUFMAN, and HAYS, Circuit Judges.
 CLARK, Circuit Judge.
 
 
 1
 Until restrained by the temporary order and preliminary injunction initially obtained by the Securities and Exchange Commission in this action, defendant Rapp engaged in the sale of stock of Taylorcraft, Inc., as a stockbroker under the name of Webster Securities Company. In this business he employed twelve salesmen, of whom defendant Benjamin Shuman was one. In this action brought pursuant to § 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t (b), the S. E. C. sought a permanent injunction against Rapp and his salesmen to prohibit specific violations of § 17(a) of the Act, 15 U.S.C. § 77q(a). The effect of the injunction would be to enjoin Rapp and his men from selling Taylorcraft without making many changes in their sales "pitch"; at stake also is the defendants' liability to the cancellation of their registrations as broker-dealers, which may follow the issuance of any permanent injunction. Securities Exchange Act of 1934, § 15(b), 15 U. S.C. § 78o(b). The S. E. C. appeals from the dismissal of its complaint by the district court. The only appellees now before us are Rapp and Shuman; as to the other salesmen named in the complaint, they either were not served or have consented to injunctions, or the action has been discontinued as to them, or — in one case — the S. E. C. has not appealed.
 
 
 2
 The S. E. C.'s complaint charged, inter alia, that Rapp's salesmen, selling by telephone after the mailing of "reports," pictured Taylorcraft, Inc., a maker of light planes, as presenting a remarkable opportunity for "growth" investment. Prospective buyers were told that the company, by virtue of government contracts and recent acquisition of another company, was "in a position to do an annual volume in excess of $5 million per year." The complaint, however, charged that for some months the company had produced nothing, and in the previous year (1957) had sustained a net loss of some $30,000; moreover, the newly purchased subsidiary had not operated for two years prior to its acquisition, and had substantial liabilities which Taylorcraft had assumed. Coupled with alleged statements that the stock would rise, from its current price of $1, to $8, per share "in a short time," these were charged to be, paraphrasing § 17(a) of the Securities Act of 1933, omissions of "material facts necessary in order to make the statements made in the light of the circumstances under which they were made not misleading," and thus violations of the Act.
 
 
 3
 At trial, the S. E. C. first introduced a "Special Report on Taylorcraft," of which 50,000 copies had been sent to prospects. This report, framed as a standard market report, began:
 
 
 4
 "We recommend the immediate purchase of Taylorcraft, Inc. common stock O-T-C priced around $1.00 per share.
 
 
 5
 "Taylorcraft, Inc., after some time for retooling and redesigning, now has perfected a product and is preparing a highly efficient means to produce the Taylorcraft Fiberglass plane for a large and growing market. We believe Taylorcraft today is on the threshold of a period of substantial growth and expansion. The fantastic market for civilian aircraft, coupled with an aggressive management and pioneering spirit, all combine to provide an exceptionally promising future for Taylorcraft, Inc. We feel that one must know the facts before one can judge. Therefore, we have attached a few of the questions and answers that we have asked ourselves before we felt that we could recommend to our clients the purchase of Taylorcraft. We are sure that after you have considered these questions, you will reach the same conclusion as we have, and will purchase Taylorcraft without any hesitation."
 
 
 6
 After some general discussion of the light-plane market, and the potential market for the fiberglass planes and other products that Taylorcraft produced, the report went on:
 
 
 7
 "Question No. 8: What has been holding Taylorcraft Corporation back from more prominence in the aircraft field?
 
 
 8
 "Answer: One must understand that the Armed Forces, with huge resources and finance, manpower and equipment at their disposal need from completion of engineering blueprints to the first plane off the line, 10½ million man hours for one heavy jet bomber and approximately ½ million man hours for one non-jet bomber. Auto manufacturers spend years creating a revolutionary new model. Here's how Taylorcraft, a much smaller, but forward looking company, have spent their time. The first fiberglass plane blueprints were completed in January, 1954. The hand made prototype made its first flight in October of 1954. Then, the development towards CAA approval. This approval, with highest operating rating was received in May, 1955, after which limited production, largely hand made, and with partial development of tooling going on at the same time, to July, 1956. Now, refining and perfecting models — then all-out concentration on developing overall, high efficiency tooling. This work brings us to the present and has now been completed."
 
 
 9
 Next, the report described Poe Machine and Engineering Company, the newly acquired subsidiary. Poe was described as "the designer and manufacturer of slitting machines" that had "received U. S. patents" and were produced "for several steel firms." The company's activity was described in the present tense.
 
 
 10
 The report's last "Question," No. 10, was, "What opportunities are there for capital gains in the stock in Taylorcraft?" The "Answer":
 
 
 11
 "We feel, with higher earnings in store for the company, as they intend and expect, they will be in a position to do an annual volume in excess of $5 million per year. This goal can only be attained by mass production. With competitive companies doing 5 to 10 times this amount, the management feels it has not set its goals too high — especially when you consider the rise in the price of the stock of the Piper Corporation which in 1937 had a range of from $1 3/8 to as high as $21½ and is currently trading at approximately $15. We feel that a great deal of the success of the Piper Corporation was due to the design and knowledge of Mr. Taylor, who originally designed and produced the first Piper Cubs, today one of the most world famous of all privately owned aircraft."
 
 A final summary followed:
 
 12
 "This company has been fighting an up-hill battle in making prototypes of their fiberglass planes. They have completed their tooling; they have manufactured quite a number of these planes on a hand made and semi-automated basis; and now they are nearly across the hump. It rests with company management as to whether they will need additional financing or whether they will be able to go into mass production on their own. In either case, we at Websters feel that the common stock of this company should be accumulated at these dollar prices for future speculative and capital gain appreciation."
 
 
 13
 Next the S. E. C. introduced seven buyers of Taylorcraft stock as witnesses. Each of them testified that they had received the "Special Report" by mail, following which they had been telephoned to by one or more of Rapp's salesmen; most seem to have gotten more than one call even when the first call resulted in a sale. Three witnesses testified that the salesman had told them that Taylorcraft had received a government contract for the manufacture of gasoline tanks; one was told that "Mr. Webster" himself had returned from Washington with the news. All said that the salesman had predicted a doubling or tripling — in one case a quadrupling — of the share price within the year; yet all seemingly regarded these statements as opinions. At least two witnesses seemed to have realized, or at least suspected, that Webster was selling these securities on its own account; but others seem definitely to have been left with the impression that Webster was acting merely as a broker.
 
 
 14
 One of the new shareholders, more enterprising than his fellows, undertook a visit to the Taylorcraft plant in Conway, Pennsylvania, shortly after buying the stock. He testified that only three people — two of them women, apparently secretaries — were there. He asked where the production workers were; he was told that the force had been temporarily furloughed pending transfer to new production facilities at Connellsville, Pennsylvania. Six months later he visited Connellsville. He found only a locked, empty hangar.
 
 
 15
 The Commission's picture of an essentially defunct company then began to take on body. First a Federal Aviation Inspector charged with inspection and certification of Taylorcraft planes testified that only 31 planes of Taylorcraft's one model had been built between 1956 and 1958, and that as of January 1957 Taylorcraft had only 3 production workers engaged in building planes, working entirely by hand.
 
 
 16
 Details of the picture were added by Rapp's accountant, one Bach. In January 1958 he commenced, at Rapp's request, an audit of Taylorcraft's financial state; apparently an S. E. C. registration was contemplated. Bach testified that the company's net worth, shown on its books as $1,000,000, was in fact no more than $100,000; that the company had lost money every year at least since 1954; that its total operating losses were about $300,000; and that current liabilities far exceeded current assets. He testified to having told Rapp of this sorry state of affairs in February-March 1958.
 
 
 17
 Last, the S. E. C. called a second accountant, McClure, who was employed by Taylorcraft to audit its books in December 1958. In the course of his audit he visited the Poe Machinery plant in New Wilmington, Pennsylvania. Here again the plant was rusty and deserted; McClure testified, admittedly as a nonexpert, that the plant had not been in production for some years.
 
 
 18
 The strategy of defense was, first, to disassociate Rapp from any statements made by his salesmen not contained in the brochure (portions of which are quoted above), and, second, to show that the brochure was not misleading. Two salesmen and Rapp himself testified that at thrice-weekly sales meetings Rapp told the salesmen repeatedly to "stick to the literature" they had been given and to say nothing else.
 
 
 19
 Rapp also took direct issue with the testimony of his accountant, Bach. He said that Bach had told him only that Taylorcraft's books needed "quite a bit of work"; he denied hearing from Bach any statement that the company was steadily losing money.
 
 
 20
 He further testified that he had been instrumental in seeking to arrange new, direct financing for the company from a group headed by a Colonel Storey, an ex-military pilot with reputed "connections in Washington," and that this would result in new orders from the government. These negotiations, he said, fell through when the S. E. C. restrained his trading in Taylorcraft. He asserted, however, that the new $500,000 they would have contributed would have allowed the company to go into the mass-production promised in the brochure.
 
 
 21
 In the district court Judge Murphy gave judgment for defendants dismissing the complaint. The principal ground of decision appears to have been that the pleadings did not conform to the proof; he denied a motion, made at the close of argument, to amend the pleadings so to conform. This ruling was clearly in error. F.R. 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." This is mandatory, not merely permissive. The rule then provides for free or delayed amendment, but states that "failure so to amend does not affect the result of the trial of these issues." Indeed, formal amendment is needed only when evidence is objected to at trial as not within the scope of the pleadings. And no objection on grounds of unfair surprise was or could have been made here; for, prior to trial, the S. E. C. made available to defense counsel the questionnaires it received in the investigation of the case which covered the expected testimony. The well known objective of the rule that cases should be decided on resolution of the actual dispute between the parties, rather than on the paper pleadings filed at the inception of suit, was thus frustrated. Val Marine Corp. v. Costas, 2 Cir., 256 F.2d 911, 915; J. J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 212 F.2d 840, 844; Saper v. Hague, 2 Cir., 186 F.2d 592; Federal Deposit Ins. Corp. v. Siraco, 2 Cir., 174 F.2d 360, 362; Fyfe v. Pan-Atlantic S.S. Corp., 2 Cir., 114 F.2d 72, 78, certiorari denied Pan Atlantic S.S. Corp. v. Fyfe, 311 U.S. 711, 61 S.Ct. 319, 85 L.Ed. 462.
 
 
 22
 The district court then said that Rapp was not responsible for the opinions of his salesmen. Since all agreed that the salesmen said only what they were told to say by Rapp, and since Rapp admittedly was responsible for the brochure he admonished them to follow, their statements, at least in so far as they did follow the brochure, were chargeable to him. Moreover, he hired men with no knowledge of the intricate business of securities, cf. Charles Hughes & Co. v. S. E. C., 2 Cir., 139 F.2d 434, certiorari denied 321 U.S. 786, 64 S.Ct. 781, 88 L. Ed. 1077, thereby ensuring that the accuracy of their representations would be wholly fortuitous in so far as he did not control their every word. In these circumstances he cannot be relieved of responsibility for their acts.
 
 
 23
 Actually it was not necessary to charge Rapp with his salesmen's statements in order to enjoin his activities. The district court found Rapp responsible for the brochure which was an element in all the sales. The testimony, some undisputed and some confirmed by Rapp himself, demonstrated that key statements in the brochure were false and misleading. Thus the brochure's summary stated that "[i]t rests with company management as to whether they will need additional financing or whether they will be able to go into mass production on their own." And mass production was concededly the prerequisite of the predicted profits. A reader of the brochure was told, in effect, that Taylorcraft had financial resources sufficient for mass production and increased profits.
 
 
 24
 Hence even if the court regarded the accountant's testimony that the company's reserves were nil as inconclusive, it could not ignore Rapp's own testimony that the failure to procure outside financing from the "Storey group" doomed the venture, and that the "proper facilities" to "move ahead" were dependent on the new money being raised. The statement that outside funds were not necessary, but only a matter of possible convenience, conveyed an admittedly false picture of financial and physical reserves. Rapp was thus in clear violation of § 17 (a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).
 
 
 25
 Moreover the S. E. C. introduced evidence that Rapp was misleading customers to think he was acting as agent, whereas he was the principal, that the brochure and reports carried out this illusion, and that this showed an additional violation of § 17(a) of the Securities Act of 1933. In fact it may also have constituted a violation of the specific regulations, Rule 15c1-4, 17 CFR § 240.15c1-4, under the Securities Exchange Act of 1934, § 15(c) (1), 15 U.S.C. § 78o(c) (1); but since the S. E. C. did not charge violation of this Act, we shall not rest decision upon it. In any event, violation of § 17(a) of the earlier Act was amply shown.
 
 
 26
 These questions decided, we find it unnecessary in the case of Rapp to pass on whether the salesmen's predictions of future value were "opinions," and, if so, whether giving such an "opinion" without disclosure of facts tending to discount it is violative of the Act. Such a ruling, it is true, would be necessary to a decision as to whether the salesman Shuman should be enjoined as well. But the district court's findings of fact are too meager for us to decide that question now. For while the necessity for outside financing gives the lie to the brochure, it does not foreclose the possibility of a rise in the stock's price to two or three dollars. And the court made no findings on whether Shuman knew or should have known of the company's financial condition, or in fact what that condition was, this last finding being a prerequisite to determining whether the "opinions" were without basis in fact. On the other hand, our conclusions of error as to Rapp require that Shuman's position be re-examined in the light of them, and that he not be excused out of hand. As to Shuman, therefore, the case is remanded for findings conforming with F.R. 52(a). McClure v. O. Henry Tent & Awning Co., 7 Cir., 184 F.2d 636, 639; Campbell v. Campbell, 83 U.S.App. D.C. 237, 170 F.2d 809. As to Rapp, individually and doing business as Webster Securities Company, the judgment is reversed for grant of a permanent injunction.
 
 
 27
 Reversed and remanded for further proceedings as to defendant Shuman and for the issuance of a permanent injunction as to defendant Rapp.