**INTERNATIONAL HARVESTER CREDIT CORPORATION and International Harvester Company, Plaintiffs,**

v.

**EAST COAST TRUCK & R. V. SALES, INC., et al., Defendants.**

**EAST COAST TRUCK AND R. V. SALES, INC., Plaintiff,**

v.

**INTERNATIONAL HARVESTER COMPANY, Defendant.**

Nos. WPB–74–3009–Civ–CF, WPB–74–439–Civ–CF.

United States District Court, S. D. Florida.

Jan. 3, 1975.

822

Smathers & Thompson, Miami, Fla.,
for International Harvester.

Mahoney, Hadlow, Chambers & Adams, Jacksonville, Fla., for East Coast Truck.

## MEMORANDUM OPINION AND ORDER

FULTON, Chief Judge.

### I. BACKGROUND OF THE CASE

This case involves a controversy between the franchisor and franchisee of a truck dealership. On April 24, 1973, the franchisor, International Harvester Company ("Harvester"), a Delaware corporation, with its principal place of business in Chicago, Illinois, and the franchisee, East Coast Truck & R. V. Sales, Inc. ("East Coast"), a Florida corporation with its principal place of business in Delray Beach, Florida, entered into a Light and Medium Duty Dealer's Sales and Service Agreement whereby Harvester would provide trucks, accessories, and parts on a credit basis for retail sale by East Coast. However, before East Coast could commence operations, it had to acquire a

motor vehicle dealers license from the Department of Motor Vehicles of the State of Florida. Florida Statutes § 320.642 (1973). Although all parties believed that East Coast would receive such license as a matter of course, the license was not issued for over seven months—until November 28, 1973. The cause of the delay was a formal protest against the issuance of the license by Rich Motors Inc. ("Rich"), a Harvester franchisee located in West Palm Beach, Florida. During the seven month waiting period, while its operating expenses continued to accrue, East Coast was unable to sell any vehicles, and refused to pay Harvester for any items received. Though mutually unanticipated, East Coast subsequently sought to impose liability upon Harvester for the alleged losses that resulted from the delay.

On March 8, 1974, East Coast filed a complaint against Harvester in Federal District Court in the Middle District of Florida which alleged actual fraud in the inducement, constructive fraud in the inducement, negligent misrepresentation, and breach of contract, and which sought to recover damages in excess of $500,000.00. The breach of contract claim was introduced in an amended complaint filed shortly before trial. On April 5, 1974, Harvester filed a complaint in Federal District Court in the Southern District of Florida against East Coast, B. Irwin Emery, ("Emery"), and Grace S. Emery. Emery is president and principal owner of East Coast. The Complaint alleged personal liability against these defendants based upon their personal guaranty of the indebtedness and obligations of East Coast. In its complaint Harvester sued to recover for the amounts due on forty-three vehicles sold and delivered to East Coast, and on notes, a security agreement and a guaranty. Harvester claimed sums due it in excess of $176,000.00. Jurisdiction in both actions was based upon diversity, 28 U.S. C. § 1332 (1966). Because the two ac-

tions consisted of essentially a claim and counter-claim between the same parties, on August 23, 1974, the cases were consolidated in the Southern District of Florida. The case was tried before the Court without a jury on November 12 and 13, 1974.

Emery is an astute, experienced, sophistocated dealer in automotive vehicles with thirty years of dealership experience in Pennsylvania and Florida. Emery knew, according to his own statements and the believable testimony of others, that before he could actively operate his dealership, he had to secure a license from the Florida Department of Motor Vehicles. He also knew that if the Department of Motor Vehicles found there was adequate representation in the community by existing licensed franchised dealers, his application could be denied. Florida Statutes § 320.642. Finally, he knew that Rich, as a potential competitor, could object to his application for a license, and that if there was a protest, that a delay would naturally ensue.

Even though both Emery and the Harvester representatives knew that a protest by Rich was possible, the testimony given at the trial established that none of the parties expected Rich to protest. In March, 1973, Emery's attorney, Mr. Ray Osborne, a former Lieutenant Governor of Florida made a statement in the presence of Emery and Harvester representatives that he knew the right people in Tallahassee and would have no trouble securing the license. In the winter of 1972–73 during the contract negotiations, Emery, his sales manager, M. W. Malcom, and Emery's step-son, Robert Powers, inquired of Harvester representative C. F. Moore concerning a possible protest by Rich. Moore responded by expressing his belief that Rich would not protest because the Rich family was primarily concerned with its ice cream business to which the Harvester franchise was a mere adjunct. Moore's good faith was reinforced on March 14, 1973 when he took Malcom to the Rich office

to place East Coast's initial orders on Rich's forms. The Court thus finds that Harvester did represent through Moore, the belief that Rich would cause no trouble by protest, but finds that the representation was made in good faith. Delray Beach, where the parties sought to locate the new franchise, is nearly 20 miles south of the Rich franchise location in West Palm Beach. There are three separate cities lying between these two locations. Apparently, the Rich franchise agreement does not precisely delineate the area thereof and there is a serious doubt as to whether the Rich franchise extends as far south as Delray Beach. Prior to Emery's application for the Delray Beach franchise, a large percentage of Rich's total sales of Harvester vehicles were made to Rich's ice cream company, not to others of the purchasing public; and for some time prior thereto, Harvester had regarded and labeled Delray Beach as an "open point", which meant that it was not being adequately serviced by any franchisee. These facts were well known to Harvester and East Coast. Thus, they both had reason to believe that Rich would not object to a new franchise in Delray Beach.

Emery commenced negotiations with Harvester for a franchise in September, 1972. The negotiations were successfully completed on March 13, 1973, when Emery signed the franchise agreement. The contract became effective on April 24, 1974 when the franchise agreement was signed by H. V. Ruth, the appropriate Harvester officer. Because Emery had no valid reason to suspect that Rich would protest, his failure to contact Rich is understandable and excusable. Emery did not learn that Rich would protest until he visited Willard Rich, Sr. ("Rich, Sr."), on April 18, 1973, at which time Rich, Sr., very clearly stated that he would not give a letter of consent. Rich, Sr. is the president of Rich Motors, Inc. and also the president of Rich Ice Cream, Inc. Thus at the time Emery signed the agreement, neither party knew that the license would not be

issued until November 28, 1973. Emery received the Order granting the license on December 5, 1973.

The parties became aware of Rich's protest in the first week of June, 1973. The evidence clearly establishes that from then on both Emery and Harvester singly and in concert did everything that could reasonably be done to obviate Rich's protest, and to hasten the issuance of the license to Emery.

The long delay in issuance of the license resulted in losses to both East Coast and Harvester, and created an atmosphere of anxiety and uncertainty. Relations between the parties became openly antagonistic. For example, East Coast had a large inventory of 1973 vehicles which it could not sell, and which would be uneconomical to sell when the 1974 models were introduced in November. Accordingly, Harvester wished to transfer East Coast's inventory to other dealers who were in a position to sell them. East Coast, in the belief that the issuance of its license was imminent and because the vehicles were then in short supply, refused on two occasions, June 20 and July 10, 1973, to transfer its inventory. In retaliation to the second refusal, Harvester revoked its credit arrangements with East Coast, and placed it on a C.O.D. delivery basis. Emery had not paid for and refused to pay for the items received from Harvester until receipt of the license. At that juncture the contractual purpose of the parties was completely frustrated.

## II. EAST COAST'S CLAIMS

East Coast sought damages claimed as a proximate result of actual or constructive fraud by Harvester in the inducement of the contract, of negligence by Harvester in failing to advise East Coast of the necessity of securing Rich's consent, and for breach of contract.

The Court finds and concludes that the evidence does not show any actual or constructive fraud on the part of Harvester or its agent, nor was there satisfactory proof of actionable negligence on the part of Harvester. Even assuming that the contract created a duty on the part of Harvester, the Court finds that it acted prudently under the circumstances, and accordingly did not breach any duty. As to East Coast's claim for breach of contract, there was a complete failure on the part of East Coast to prove by the preponderance of the evidence any damages directly resulting from any of its claims. The evidence clearly indicates that Harvester did not breach any duty imposed by the contract. Both parties agreed that East Coast had the obligation of obtaining the license. Harvester's only obligation was to establish, if called upon to do so, that there was inadequate representation of its franchise in the community. After Rich filed its protest, Harvester demonstrated inadequate representation to the appropriate authorities, and the license was subsequently issued.

East Coast's proof of damages was limited to a summary by its accountant, not the bookkeeper. The accountant knew nothing of the underlying facts except what he saw in the ledger books of the company. The Court struck the entire testimony of the accountant as well as East Coast exhibit # 32, a work sheet prepared by East Coast's accountant which purported to reflect East Coast's damages, for the following reasons: 1) No supporting journal or ledger was introduced to support the summary; 2) The witness had no first hand knowledge of the information about which he testified; 3) The witness could make no allocations of expenses incurred solely on the Harvester franchise and those incurred on Emery's four or five other franchises, except for a few items; and 4) The books were not made available to Harvester until the first day of the trial thus affording Harvester no opportunity to examine them. *See* Midcontinent Broadcasting Co. v. North Central Airlines, Inc., 471 F.2d 357, 359–360 (8th Cir. 1973); Youngs Drug Products Corp. v. Dean Rubber Mfg.

Co., 362 F.2d 129, 134 (7th Cir. 1966); Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39, 43–44 (6th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); Atlantic & Pacific Ins. Co. v. Combined Ins. Co. of America, 312 F.2d 513, 516 (10th Cir. 1962); In re Shelley Furniture, Inc., 283 F.2d 540, 543–544 (7th Cir. 1960).

Accordingly, East Coast has not proved any one of its alternate theories for recovery, but is not left without a remedy because of the equity jurisdiction of the Court, as later invoked.

## III. HARVESTER'S CLAIMS

The parties stipulated that the following amounts were unpaid by East Coast:

1. Amounts due on forty-three vehicles and notes:

$144,907.95 representing principal amount left showing on the notes

17,484.34 representing interest through November 12, 1974

$162,392.29 Total

2. Amounts due on the Open Account. The Open Account consists of charges for down payment on equipment of $100.00 per vehicle and insurance charges:

$ 4,217.54 representing principal

878.69 representing interest through November 12, 1974

$ 5,096.23 Total

Thus Harvester's total claim amounts to:

$162,392.29

5,096.23

$167,488.52

---

East Coast thus not dispute that the sum of $167,488.52 is unpaid. Its only defense to Harvester's claim is that the amount is not due because of East Coast's claims of fraud, negligence, and breach of contract. Thus, since East Coast's affirmative defenses are insufficient, if the Court were to make no further findings of fact and conclusions of law, Harvester would be entitled to recover from East Coast the uncontested amount of $167,488.52. However, for the reasons herein stated the Court finds and concludes that it would be manifestly unfair and unjust to permit Harvester to recover from East Coast said sum. The facts of this case coupled with the Court's equity jurisdiction require the Court to fashion another and different remedy, one that will do justice in this case not only for Harvester but also East Coast.

## IV. MUTUAL MISTAKE OF FACT AND FAILURE OF CONSIDERATION

The Court has decided that the representations made by Moore to Emery in the presence of others that Rich would give no trouble were not fraudulently or negligently made, but were simply an expression of opinion. However, the Court does find that both Harvester and Emery were laboring under a mutual mistake of fact as to the possibility of a protest by Rich both at the time of the signing and approval of the franchise dealership agreement and financing contract. Obviously either side could have contacted Rich between September, 1972, and April, 1973, and learned of Rich's objection to the East Coast franchise. However, the facts are that neither party did contact Rich for that purpose until Emery did so on

April 18, 1973, over a month after he had signed the contract. Although it is true that Emery made no disclosure to Harvester of his conversation with Rich, Sr. until after the protest was filed in June, 1973, Emery's failure to advise Harvester is understandable and excusable in light of Harvester's representations that no trouble from Rich was expected, and upon the belief that Emery could rely on Harvester's representation about its own franchisee.

Harvester and Emery knew that Rich had actually filed a protest in June, 1973. However, even with the knowledge that Rich had filed a protest, neither party expected that the issuance of the license would be interminably delayed, and in fact both sides expected that the protest would be promptly dismissed. Thus there was a second mutual mistake of fact as to the length of delay that the protest would cause.

On July 10, 1973 Emery declined Harvester's second offer to transfer some of East Coast's vehicles to other dealers thereby balancing East Coast's inventory and making it possible to substitute the 1973 vehicles with 1974 vehicles. Upon Emery's decline of the offer, Harvester canceled East Coast's floor plan and other credit arrangements, and placed East Coast on a C.O.D. basis. Emery testified, and the Court finds, that the termination of credit arrangements made operation of the dealership financially difficult if not impossible. Emery had made a capital investment of $75,000.00 in the dealership, but in order to operate the dealership, floor plan financing was not only necessary, but contemplated and agreed to by Harvester. Thus the cancellation by Harvester of the financing arrangements would inevitably so frustrate the dealership purposes that it can be considered equivalent to a failure of consideration by Harvester of its contract obligations.

The evidence shows that both parties recognize that performance of the dealership agreement has been frustrated and that any operations thereunder hereafter are impossible. Both parties have framed their actions in the form of suit for enforcement of contract obligations. However, to pretend that a going contractual relationship exists is to engage in fantasy. Although cancellation and rescission of the dealership and financing agreements were not sought by either side, the Court is of the view that cancellation and rescission are the remedies that will come closest to doing justice in this case.

## V. AMENDMENT OF COMPLAINT TO CONFORM WITH EVIDENCE

 The Court amends the complaint to conform with the evidence pursuant to Fed.R.Civ.P. 15(b). Although East Coast did not specifically allege mistake, the evidence introduced at the trial without objection proved that the parties operated under two mutual mistakes of fact. Although neither party requested rescission of the contract, the Court must shape the remedy which the evidence shows to be appropriate. Fed. R.Civ.P. 15(b) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Thus the Court shall treat the issue of whether rescission and cancellation are proper in light of the mutual mistakes of fact as having been raised by both complaints. Wallin v. Fuller, 476 F.2d 1204, 1210 (5th Cir. 1973); City of Green Cove Springs v. Donaldson, 348 F.2d 197, 201–202 (5th Cir. 1965); Cameron v. Federal Auto Parts, Inc., 301 F.2d 867, 869 (5th Cir. 1962); Pearl Assur. Co., Ltd. v. First Liberty National Bank, 140 F.2d 200, 202 (5th Cir. 1944); Fidelity & Casualty Co. of New York v. Mitchell, 134 F.2d 537, 538 (5th Cir. 1943). When issues not raised by the pleadings are tried without objection, it is not discretionary, but rather mandatory for the court to treat them as if they had been so raised. Securities & Exchange Commission v. Rapp, 304 F.2d 786, 790 (2d Cir. 1962). This procedure is proper in a nonjury case. In fact, when the evidence clearly

presents the issue and is not objected to, it would be an injustice to the plaintiff not to make a finding on the evidence presented. Hester v. New Amsterdam Casualty Co., 287 F.Supp. 957, 972 (D. S.C.1968).

In one case involving allegations of breach of contract, both parties formulated their pleadings and went to trial on the theory that the contract was still in effect. Nevertheless, the court treated the pleadings as amended under Fed. R.Civ.P. 15(b) to conform to the evidence which demonstrated mutual mistake of fact and the necessity for rescission of the contract by mutual consent. Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 199 F.2d 511, 514 (8th Cir. 1952). *See also* National Dairymen Association v. Dean Milk Co., 183 F.2d 349, 355 (7th Cir. 1950). Similarly, the Court here amends the pleadings to conform to evidence presented that tends to establish that there *should be* a rescission of this contract.

## VI. COURT'S EQUITY JURISDICTION

■■ Even without the use of Fed. R.Civ.P. 15(b), the court has the power pursuant to its equity jurisdiction to apply the remedy it deems just. It has often been said that a court of equity is a court of conscience which should not be shackled by rigid rules of procedure. Wicker v. Board of Public Instruction of Dade County, Florida, 106 So.2d 550, 558 (Fla.1958). In a leading Florida case concerning the court's equity jurisdiction, the court held: "[R]elief by way of cancellation lies within the sound discretion of the court, to be exercised according to what is reasonable and proper under the circumstances of each particular case; and the court will, in granting relief, impose such terms as it deems the real justice of the case to require . . . ." International Realty Associates, Inc. v. McAdoo, 87 Fla. 1, 99 So. 117, 119 (1924). Although the power of a court of equity to impose rescission is an exceptional one, it is well recognized. It is appropriate when, in

the court's discretion, it will do justice. Ganaway v. Henderson, 103 So.2d 693, 695 (Fla.App., 1st D.C.A.1958).

■ A maxim of equity is that "[e]quity will not suffer a wrong to be without a remedy." Connell v. Mittendorf, 147 So.2d 169, 172 (Fla.App., 2d D.C.A.1962). Another principle of equity is that "equity aids the vigilant and not those who slumber on their rights." Matousek v. Cooper, 111 So.2d 65, 68 (Fla.App., 2d D.C.A.1959). It is arguable that both parties failed to exercise diligence in this case during the contract negotiation period in that both or either could have inquired of Rich as to whether it would protest. Emery did, however, inquire of Moore as to whether a protest from Rich was expected. Moore replied that there would be no trouble from Rich. The Court finds that Moore had no intent to deceive Emery, but made the statement because he believed it to be true. Emery knew that he had the obligation of securing the license, and that a protest could prevent its issuance. Nevertheless, the Court finds that it was reasonable for Emery to assume that he could rely upon Moore's representation concerning Harvester's own franchisee, and that no independent investigation on his part was necessary. Thus, both parties acted in good faith upon the belief that there would be no protest, and that even if there was one, there would be no extended delay. Thus the maxim that equity aids only the vigilant does not bar the Court from invoking its equity jurisdiction.

## VII. MUTUAL MISTAKE SUPPORTS RESCISSION

■ Mutual mistake of a material fact is a sufficient ground for equitable rescission. The Court has found that the evidence introduced at the trial established the occurrence of two mutual mistakes of fact: 1) Both parties mistakenly believed that there would be no protest; 2) Both parties mistakenly believed that the protest Rich filed would be swiftly resolved without protracted delay. Florida case law clearly estab-

lishes the principle that a mistake or misrepresentation of material facts, if relied upon by the other party to his detriment, constitutes a sufficient ground for rescission and cancellation in equity. Sutton v. Cast-Crete Corporation of Florida, 197 So.2d 556, 558 (Fla. App., 2d D.C.A.1967). As explained in the leading Florida case on the rescission of contracts, innocent misrepresentation of fact, if acted upon in reliance by the other party, is ground for rescission and cancellation in equity because no meeting of the minds ever occurred. Langley v. Irons Land & Development Co., 94 Fla. 1010, 114 So. 769 (1927). See Worsham v. Pierce, 251 So.2d 896, 898 (Fla.App., 1st D.C.A.1971) (quoting Langley with approval). See also Rosenthal v. First National Fire Ins. Co. of the U. S., 74 Fla. 371, 77 So. 92, 94 (1917). In International Realty Associates v. McAddo, 87 Fla. 1, 99 So. 117, 119 (1924) the court held that mutual mistake as to material facts which constitute an inducement to the contract and upon which the party had a right to rely, will give equity jurisdiction to fashion an appropriate remedy. Accord, St. Lucie Estates v. Nobles, 105 Fla. 421, 141 So. 314 (1932). "Inherent in equity jurisprudence is the doctrine that equity will always move to prevent an injustice engendered by . . . mistake." Hedges v. Lysek, 84 So.2d 28, 31 (Fla.1955). Accord, Moore v. Garrison, 148 Fla. 653, 5 So.2d 259, 262 (1941).

Harvester's placing East Coast on a C.O.D. basis after July 10, 1973 was tantamount to a failure of consideration, and constituted substantial nonperformance of the contract obligations by Harvester. Although the terms of the contract did provide that the finance plans might be withdrawn at any time without notice (clause 15 of the Contract), both parties knew that the credit arrangement was absolutely essential for a dealership operation. The Court finds and concludes that rescission is proper on the ground of mutual mistake of fact. However, the Court notes that the substantial nonperformance by Harvester so frustrated the dealership purposes as to create an alternative ground for rescission and cancellation of the contract. Singleton v. Foreman, 435 F.2d 962, 970–971 (5th Cir. 1970); Ganaway v. Henderson, 103 So.2d 693, 695 (Fla.App., 1st D.C.A.1958).

## CONCLUSION

East Coast has failed to satisfactorily prove any of its claims. Even if one, or more of its claims had been established, East Coast failed to prove damages with any degree of clarity or certainty. However, to require East Coast to pay for the now obsolete trucks and unsold or unused other items would be so unfair and unjust as to constitute a miscarriage of justice.

The greater weight of the evidence clearly demonstrates that throughout the entire period of negotiations and after the agreements were executed there existed mutual mistakes of material facts, which directly resulted in complete frustration of the contractual purposes of the parties. The relationship between the parties has been ruptured, to the extent that the agreements are now, and have been for some time, totally unworkable. The evidence and the ends of justice mandate that the agreements between the parties be rescinded and cancelled, as of the date of their execution.

Thereupon it is ordered and adjudged as follows:

1. The contractual agreements between the parties are hereby rescinded and cancelled, as of the date of their execution.

2. All Harvester vehicles which East Coast has sold shall be paid for by East Coast from the escrow account, wherein the proceeds of such sales have been deposited, or from other funds if the escrow account is insufficient for that purpose.

3. East Coast shall deliver to Harvester at East Coast's place of business in Delray Beach all Harvester vehicles which have not been sold by East Coast.

4. East Coast shall deliver to Harvester at East Coast's place of business in Delray Beach all other personalty which East Coast has not sold or used, and shall pay Harvester for those items which have been sold or used.

5. Neither side is entitled to recover from the other any attorney's fees; each party shall pay its own costs.

6. Counsel for the parties shall submit to the Court within ten days hereafter a form for entry of Final Judgment which shall succinctly document these rulings and which shall provide for retention of jurisdiction for the purpose of enforcing the provisions of this Order.