270 F.2d 241
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
Garland L. CULPEPPER, Jr., Albert J. Grayson, George Phillip Barton, Rockwell Securities Corporation, A. J. Grayson & Co., Incorporated, and Brown, Barton & Engel, Defendants-Appellants.
 No. 171.
 Docket 25242.
 United States Court of Appeals Second Circuit.
 Argued April 8, 1959.
 Decided September 10, 1959.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John H. Kelley, New York City (Lee Feltman, New York City, of counsel), for Garland L. Culpepper, Jr. and Rockwell Securities Corporation.
 Max M. Greenfield, New York City (Lichtig, Copland & Greenfield, New York City, on the brief), for Albert J. Grayson and A. J. Grayson & Co., Inc.
 Milton E. Mermelstein, New York City (Gordon, Brady, Caffrey & Keller, and Stephen Bermas, New York City, on the brief), for George Phillip Barton and Brown, Barton & Engel.
 Ellwood L. Englander, Special Counsel, Securities and Exchange Commission, Washington, D. C. (Thomas G. Meeker, General Counsel, and Alger B. Chapman, Jr., Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for S. E. C.
 Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 On June 21, 1956, Micro-Moisture Controls, Inc. (Micro-Moisture), a Delaware corporation, issued 2,396,485 shares of unregistered stock in exchange for the assets of Converters Acceptance Corporation, Ltd. (Converters), a Canadian corporation, which in turn distributed these shares to its thirty-one stockholders. Twenty-six of them immediately granted John Herschorn, one of their number, irrevocable powers of attorney for the sole purpose of selling the stock. The Herschorn group, through the record ownership of more than 43% of the common stock of Micro-Moisture, was in common control with, or under the control of Louis Levin, who dominated and controlled Micro-Moisture after June 21, 1956. Herschorn sold at least 710,623 of these unregistered shares to various brokers and dealers, defendants in this action, who subsequently resold them to the public through the use of the mails.
 
 
 2
 Pursuant to Section 20(b) of the Securities Act of 1933 (15 U.S.C.A. § 77t (b)(2)), the Securities and Exchange Commission brought suit on January 9, 1957, to enjoin the defendants from further alleged violations of the registration provisions of Section 5(a) and (c) (15 U.S.C.A. § 77e(a) and (c)). A preliminary injunction issued by Judge Ryan, Securities and Exchange Commission v. Micro-Moisture Controls, Inc., D.C., 148 F.Supp. 558, was made final after a lengthy trial before Judge Edelstein. Judge Edelstein found, 167 F.Supp. 716, that it was "in the public interest" to enjoin the three appellants herein, who had sold an aggregate of 343,495 of the unregistered shares of Micro-Moisture, and the ten other defendants below, from using the channels of interstate commerce for the purposes of dealing in the stock of Micro-Moisture, unless a registration statement is in effect or unless the stock is exempt from the provisions of Section 5 of the Act. From this judgment the individual appellants and their wholly owned corporations, George Phillip Barton, and Brown, Barton & Engel (Barton), Albert J. Grayson and A. J. Grayson & Co., Inc. (Grayson), and Garland L. Culpepper and Rockwell Securities Corporation (Culpepper), appeal. Each of them claims error in the district court's ruling that they violated the Act and each further argues that even if violations be conceded the Court abused its discretion in issuing a permanent injunction. For the reasons hereinafter discussed we affirm the challenged judgment.
 
 
 3
 Section 5(a)[1] of the Act makes unlawful the use of the mails or interstate commerce for the purpose of selling securities unless a registration statement is in effect with the Commission. Section 4[2] excludes certain "exempted transactions" from the provisions of Section 5(a) and the plaintiff concedes the lawfulness of appellants' sales of unregistered Micro-Moisture stock if they did not act as "underwriters" within the meaning of Section 4.
 
 
 4
 The term "underwriter" is defined as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." Section 2(11) (15 U.S.C.A. § 77b(11)). For purposes of this section the term "issuer" includes "any person directly or indirectly controlling[3] or controlled by the issuer, or any person under direct or indirect common control with the issuer."
 
 
 5
 We recently held that the burden is on a broker-dealer to prove his claimed exemption from the provisions of the Act, Gilligan, Will & Co. v. Securities and Exchange Commission, 2 Cir., 267 F.2d 461, following the rationale of Securities and Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. In the case now before us not only did the appellants fail to discharge this burden but we find ample evidence supporting the conclusion that each of them was an "underwriter." For the trial court reasonably found the Herschorn group to be in common control with, or under the control of the issuer. Thus each of the individuals in the control group was an issuer for purposes of defining "underwriter." It is undisputed that Culpepper purchased directly from Herschorn the 5,000 shares of unregistered stock which he had sold publicly by September 10, 1956. The evidence also clearly demonstrates that Barton dealt directly with Herschorn as the attorney for the two shareholders of Converters from whom he purchased 66,945 shares of Micro-Moisture stock, and in the absence of contrary evidence we must conclude that they were two of the stockholders found to be in common control of, or controlled by, the issuer. The fact that these two stockholders owned only 1½% of the issued Micro-Moisture stock does not make erroneous the conclusion that they were "under direct or indirect common control with the issuer." (Emphasis added.) Thus it appears that both Culpepper and Barton purchased directly from an issuer with a view for sale and were underwriters within the meaning of the Act.
 
 
 6
 Grayson purchased all the shares which he resold to the public from other brokers. And so he argues that he could not be an "underwriter" since he did not directly purchase shares from the control group nor have any privity of contract with such group. This argument is vulnerable on at least two grounds.
 
 
 7
 First. In an early case we noted the underlying policy of the Act, that of protecting the investing public through the disclosure of adequate information, would be seriously impaired if we held that a dealer must have conventional or contractual privity with the issuer in order to be an "underwriter." Securities and Exchange Commission v. Chinese Consol. Benev. Ass'n, 2 Cir., 120 F.2d 738, certiorari denied 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497. Indeed, the Act includes within the definition of underwriter one who "participates or has a direct or indirect participation in any such undertaking." Grayson purchased at least 207,000 of the unregistered shares of Micro-Moisture from defendant below, McGrath Securities, a wholly owned broker-corporation of Robert C. Leonhardt. On July 9, 1956, Grayson and Leonhardt had borrowed from the same New York bank $100,000 and $50,000, respectively. Herschorn, pursuant to his powers of attorney delivered 300,000 shares of Micro-Moisture stock involved in the Converters transaction as collateral security for these loans and the loan proceeds were turned over to Levin, the president of Micro-Moisture. On the same day Levin borrowed $60,000 from the same bank, pledging 120,000 shares of Micro-Moisture stock which had been issued in the same Converters transaction. Moreover, Grayson had previously participated in a similar accommodation loan in helping to swing the Peeby transaction, hereinafter discussed, but relevant to this case in that it paralleled the Converters merger transaction. Thus the evidence abundantly demonstrates Grayson's closeness with the control group and amply supports the conclusion that Grayson "participated" in the underwriting if that word is to be given a reasonable interpretation.
 
 
 8
 Second. Quite apart from these considerations, we also held in the Chinese Consol. Benev. case, supra, that Section 4(1) was intended to exempt only trading transactions between individual investors with respect to securities already issued and not to exempt distributions by issuers or acts of other individuals who engage in steps necessary to such distributions, even if such individuals themselves do not come within the definition of "issuer, underwriter, or dealer." Grayson consciously engaged in steps necessary to the consummation of the public distribution of shares by the issuer and he can not invoke the exemption provided by Section 4(1).
 
 
 9
 Culpepper also challenges the finding that he acted as an "underwriter" in selling 45,000 shares of unregistered stock which he received as repayment of a stock loan from defendant below, Robert C. Leonhardt. Elaborate arguments were made by the Commission to counter the appellant's thesis that since the loan repayment was not a "purchase from an issuer" Culpepper could not be an underwriter as to this stock. In light of what has been said, it suffices here to merely reiterate that a direct or indirect participation in the distribution brings a dealer within the definition of underwriter. Culpepper, one of the largest stockholders of Micro-Moisture, had recently resigned as president of that company and was serving as a consultant at the time of the Converters transaction. He knew or reasonably should have known that the stock he received in repayment of his "free"[4] stock loan was unregistered stock emanating from the Converters transaction and his close connection with the control group firmly demonstrates his "participation" in the issuance of this Micro-Moisture stock. A contrary holding here, in light of the evidence advanced against Culpepper, would open wide an escape hatch from the registration provisions of the Act. It will be time enough to decide when the case arises whether the sale, without knowledge of any "taint," of stock received in repayment of a "free" stock loan would technically establish the seller a "participant" in the distribution of unregistered stock.
 
 
 10
 The appellants next invoke Rule 133[5] of the General Rules and Regulations of the Securities and Exchange Commission as providing an exemption for the complained of transactions. This rule provides that under certain conditions the corporate exchange of stock for the assets of another corporation and the subsequent distribution of the stock to the stockholders of such corporation will not be considered a sale for the purposes of Section 5. We fail to see how this rule assists the appellants because it speaks only of the original transfer of shares to the merged corporation's shareholders. It in no way provides an exemption for a subsequent sale of nonregistered stock by these shareholders and since the Herschorn group was "an issuer" the subsequent sales by its members were illegal. Great Sweet Grass Oils Limited v. Securities and Exchange Commission, 103 U.S.App.D.C. 179, 256 F.2d 893, affirming 37 S.E.C. 683. Moreover, we agree with Judge Ryan's conclusion that Rule 133 is inapplicable to the entire transaction, since [148 F.Supp. 562] "the shareholders of Converters Acceptance were and are in control of Micro-Moisture" and "the `exchange' of Converters assets for Micro-Moisture stock was but a step in the major activity of selling the stock."
 
 
 11
 The appellants Grayson and Barton seek to invoke an estoppel against the Commission because of its alleged prior acquiescence in the so-called Peeby transaction, also involving Micro-Moisture stock, after which the Converters transaction was exactly patterned. Initially, we note the meagerness of evidence indicating Commission acquiescence in the Peeby transaction, if by that term the appellants mean approval of prior behavior with full knowledge of the facts. A Securities investigator did make a routine inspection of the books of McGrath Securities sometime in March or April of 1956, at which time he learned of the Peeby transaction and examined the powers of attorney which had been given to Levin authorizing him to sell the Micro-Moisture stock which had been distributed to Peeby's shareholders. Further discussion ensued with a Chief Investigator in the next several days and on April 20, 1956, less than two months prior to the Converters transaction, an investigation was instituted into the Peeby transaction. The Commission did not receive the basic documents relating to the Peeby transaction until sometime prior to August 17, 1956. There is no indication in the record that the examining officers expressed the slightest approval of the Peeby transaction. They in fact, in the course of their Peeby examinations of October 22 and 25, 1956, advised the defendants Leonhardt and McKenna to obtain an opinion from the Interpretative Division with respect to the question of the control relationship in the Converters transaction, the same legal question raised by the Peeby transaction. Less than a month later, on November 8, 1956, the plaintiff instituted the investigation leading to the instant litigation. Thus no fact-basis for an estoppel has been proved: we agree with the Court below that neither the Commission nor its staff directly or indirectly caused the defendants to understand that it concurred in the legality of the Peeby sales.
 
 
 12
 It is not amiss to add, however, that the Commission would not now be estopped even if it had acquiesced in the Peeby transaction. It has often been said that "the Commission may not waive the requirements of an act of Congress nor may the doctrine of estoppel be invoked against the Commission." Securities and Exchange Commission v. Morgan, Lewis & Bockius, 3 Cir., 209 F.2d 44, 49; Securities and Exchange Commission v. Torr, D.C.S.D.N.Y., 22 F. Supp. 602; cf. United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050. The appellants' reliance on the case of Klein v. Securities and Exchange Commission, 2 Cir., 224 F.2d 861, is misplaced. There, the expulsion of a dealer from the National Association of Security Dealers had been challenged. We carefully pointed out that no estoppel was involved. In the instant case we are dealing with the propriety of an injunction to prevent future violations of an Act of Congress and Commission acquiescence has not been proved.
 
 
 13
 Throughout the appellants' arguments runs the theme that their violations, if any, were innocent; that they ceased selling the "tainted" stock prior to the commencement of the action on learning that the Commission questioned the legality of the transaction; and that the district court therefore abused its discretion in issuing the injunction which will unfairly punish them. The punishment, they argue, is not that they are enjoined from engaging in future proscribed acts, which of course would not be "punishment" at all, but rather that the injunction may precipitate revocation proceedings leading to the revocation of their broker-dealer registrations.
 
 
 14
 The Commission is authorized to bring an action and the district court to issue an injunction when it appears "that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation" of the Act. Section 20(b) (15 U.S.C.A. § 77t(b)). It is clear, from the plain language of the Act, that the appellants' cessation of their illegal activities prior to the commencement of this action would not preclude the issuance of an injunction especially if brought about by a Commission investigation. Indeed, in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, a case involving injunctions under § 205(a) of the Emergency Price Control Act of 1942, the Court said, at page 327 of 321 U.S., at page 591 of 64 S.Ct.: "We agree that the cessation of violations, whether before or after the institution of a suit by the Administrator, is no bar to the issuance of an injunction." See also Warner Holding Co. v. United States, 8 Cir., 204 F.2d 156, 159. A contrary ruling would work havoc with the Act's policy of protecting the investing public. Even in Securities and Exchange Commission v. Torr, 2 Cir., 87 F.2d 446, 449, a case upon which the appellants heavily rely, we noted:
 
 
 15
 "[O]rdinarily, it is no sufficient answer to a motion for an injunction that the improper conduct repeated in the past has been discontinued when action to impose legal restraints is known or thought to be in the offing * * * for the likelihood of a resumption of the acts is a continuing menace." (Emphasis supplied.)
 
 
 16
 See also, Otis & Co. v. Securities and Exchange Commission, 6 Cir., 106 F.2d 579. It is true that we reversed the issuance of a preliminary injunction in Torr where the defendant had taken reasonable steps to assure compliance with the Act and the practices had ceased prior to the bringing of the suit after Commission disapproval was made known. But we explicitly held that the preliminary injunction was improvidently granted only because of the total lack of showing that the defendant was "engaging in any unlawful activities" or was "about to engage in any at the time suit was brought." After all, the Supreme Court held in Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, that the defendants' bona fide but mistaken misinterpretation of the law was no reason not to enjoin acts carried on at the time of suit. We see no significant difference in the situation here where the defendants ceased their activities prior to suit but after the instigation of a Commission investigation and where their past behavior gives indication that without injunctive measures they might again engage in such activities.
 
 
 17
 The critical question for the court in cases such as this is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby. As the court said in United States v. W. T. Grant Co., 345 U.S. 629, at page 633, 73 S.Ct. 894, at page 897, 97 L.Ed. 1303:
 
 
 18
 "The case may nevertheless be moot if the defendant can demonstrate that `there is no reasonable expectation that the wrong will be repeated.' United States v. Aluminum Co. of America, 2 Cir., 148 F.2d [416] at page 448. The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.
 
 
 19
 "Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. Hecht Co. v. Bowles, supra; Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 1916, 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248. The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."
 
 
 20
 Earlier decisions in this circuit which apply this principle to the Securities Act are not to the contrary. Securities and Exchange Commission v. Okin, 2 Cir., 1943, 139 F.2d 87, 88;[6] Securities and Exchange Commission v. Franklin Atlas Corp., D.C.S.D.N.Y., 154 F.Supp. 395. See also Securities and Exchange Commission v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, certiorari denied 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519; R. J. Koeppe & Co. v. Securities and Exchange Commission, 7 Cir., 95 F.2d 550; Securities and Exchange Commission v. Mono-Kearsarge Consol. Min. Co., D.C. Utah, 167 F.Supp. 248.
 
 
 21
 The court below concluded that a permanent injunction was necessary for the protection of the public interest, and we think that in this conclusion there was implicit a finding of a reasonable expectation of further violations. In the formulation of its discretion it should recognize that the public interest, when in conflict with private interest, is paramount. As was said in Hecht Co. v. Bowles, supra, 321 U.S. at page 331, 64 S.Ct. at page 592: The discretion of the courts "must be exercised in light of the large objectives of the Act. For the standards of the public interest not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." The existence of seasoned stock, on its face indistinguishable from the tainted stock, make dealings in the stock particularly difficult to police. Surely the Commission should not be required to keep these appellants under surveillance and to bring a subsequent injunction action if they commence again to sell "tainted stock." We hold that the exercise of discretion as made below was in full accord with the facts and the law.
 
 
 22
 The court below found, and we think quite properly, that the appellants knew, or in the exercise of reasonable care should have known, that they acted as underwriters in their sales of Micro-Moisture stock. It is clear that all of the appellants were aware, or with slight investigation would have been aware, that the stock they sold was unregistered. It is an equally reasonable inference that at least Grayson and Culpepper, because of their close connections with the control group, knew the totality of circumstances surrounding the offering. Both of them had engaged in the Peeby transaction. Grayson, and in all probability Culpepper, knew of the Commission investigation into that transaction some time prior to July 17, 1956, and yet they both continued to engage in sales of Micro-Moisture stock derived from the Converters transaction. Grayson continued selling until some time after the Commission had commenced its investigation of the Converters transaction. He alleges that he had discontinued his entire stock business prior to the time of trial. But we fail to see how this fact destroys the propriety of the injunction issued against him: there is nothing to prevent him from again entering into business, possibly in the name of another. Securities and Exchange Commission v. Lawson, D.C.Md., 24 F.Supp. 360. Cf. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102.
 
 
 23
 Culpepper completed the sale of the 5,000 shares which he had received from Herschorn by September 20, 1956. He challenges the finding that sales of the 45,000 shares which he received in the loan transaction continued until December 6, 1956 and claims that this stock had been completely sold by October 31, 1956, prior to the Commission investigation. The fact that Culpepper is not presently in possession of "tainted" stock is not decisive in considering the propriety of enjoining future illegal acts, Securities and Exchange Commission v. Mono-Kearsarge, supra, and even assuming he had completed his sales of "tainted" stock prior to the Commission investigation, we think it was not error to find that the objectives of the Act will be served by enjoining future violative activities. The character of his past behavior, his close association with Micro-Moisture, and the large quantities of unregistered Micro-Moisture stock issued in the Converters transaction remaining unsold, combine to support this conclusion.
 
 
 24
 Barton, of the several appellants, presents the strongest, but we think an inadequate, case for reversing the trial court's action as arbitrary. Barton neither participated in the Peeby transaction nor engaged in sales of Micro-Moisture stock prior to those discussed herein. After a month of selling, Barton ceased his sales after learning of the impending Commission investigation. He argues that this fact plus his reasonable reliance on representations from the two stockholders from whom he purchased to the effect that they were not officers, directors, or controlling stockholders of Micro-Moisture, and supporting legal advice to the same effect, make the trial court's action arbitrary. Moreover, he contends that he didn't know the other defendants or have familiarity with the corporation proceedings discussed herein. But this latter contention, we note in passing, seems inconsistent with his insistence that he was entitled to rely upon the earlier Peeby transaction. In any event, as previously noted, we think the action of the Commission with respect to the Peeby transaction was inadequate support for a belief in the validity of a public sale of 66,945 shares of unregistered Micro-Moisture stock. It is significant that Barton, as well as the other appellants, initially made no attempt to discover the Commission's opinion as to the legality of the Converters transaction and the record shows that Barton's counsel's opinion as to the legality of the transaction was sought only after the Commission's investigation was known to them. We think that Barton's sole reliance on the self-serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts demonstrate both his obvious familiarity with the consequences of control and a behavior which at best was unconcerned with compliance with the Act. We accept as correct the recent reply made to an argument similar to that made by Barton with respect to his lack of knowledge of the control relationship; "with all these red flags warning the dealer to go slowly, he cannot close his eyes to obvious signals which if reasonably heeded would convince him of, or lead him to, the facts and thereafter succeed on the claim that no express notice of these facts were served upon him." Securities and Exchange Commission v. Mono-Kearsarge Consol. Min. Co., supra.
 
 
 25
 The appellants make one claim of error which is concededly technical. They contend that the plaintiff failed to prove by documentary evidence offered as to each of them that the Micro-Moisture stock concededly sold by each was identified as derived from the Converters transaction. However, we are satisfied that by admissions, by stipulation and on trial, by correspondence with the appellants' vendors and by evidence admissible and admitted against each appellant the record demonstrates beyond all question that the sales in question were of unregistered stock. Certainly the appellants did not prove that the stock each sold was exempt under Section 4(1) of the Act. Gilligan, Will & Co. v. Securities and Exchange Commission, supra.
 
 
 26
 Finally, we note that considerations of the possible effects of this injunction in future revocation proceedings under Section 15(b) of the Act (15 U.S.C.A. § 78o (b)), are not germane to our determination here.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "Sec. 5(a) — Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly —
 "(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
 "(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation any such security for the purpose of sale or for delivery after sale."
 
 
 [2]
 "Sec. 4 — The provisions of Section 5 shall not apply to any of the following transactions:
 "(1) Transactions by any person other than an issuer, underwriter, or dealer; * * *".
 
 
 [3]
 Rule 405 of the Regulations promulgated by the Securities and Exchange Commission under the Securities Act of 1933 defines the word "control" as follows:
 "The term `control' (including the terms `controlling,' `controlled by' and `under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise."
 
 
 [4]
 Throughout this opinion, "free" stock designates duly registered stock available for unrestricted sale. And "tainted" stock designates unregistered stock sold in violation of the Act
 
 
 [5]
 The full text of Rule 133 is as follows:
 "For purposes only of section 5 of the Act, no `sale', `offer', `offer to sell', or `offer for sale' shall be deemed to be involved so far as the stockholders of a corporation are concerned where, pursuant to statutory provisions in the State of incorporation or provisions contained in the certificate of incorporation, there is submitted to the vote of such stockholders a plan or agreement for a statutory merger or consolidation or reclassification of securities, or a proposal for the transfer of assets of such corporation to another person in consideration of the issuance of securities of such other person or voting stock of a corporation which is in control, as defined in section 368(c) of the Internal Revenue Code of 1954 [26 U.S.C.A. § 368(c)], of such other person, under such circumstances that the vote of a required favorable majority (1) will operate to authorize the proposed transaction so far as concerns the corporation whose stockholders are voting (except for the taking of action by the directors of the corporation involved and for compliance with such statutory provisions as the filing of the plan or agreement with the appropriate State authority), and (2) will bind all stockholders of such corporation except to the extent that dissenting stockholders may be entitled, under statutory provisions or provisions contained in the certificate of incorporation, to receive the appraisal or fair value of their holdings."
 
 
 [6]
 Here too we took as the test the "likelihood of its resumption" of the illegal acts