SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

BROADWALL SECURITIES, INC., Ar-
nold Mahler, Jack Einiger, Alexander
Lapidus, Stanley Miller, Defendants.

United States District Court
S. D. New York.

March 2, 1965.

Llewellyn P. Young, Regional Administrator, S. E. C., New York City, for plaintiff, Lawrence M. Levy, David Y. Handelman, New York City, of counsel.

Irwin L. Germaise, New York City, for defendants Broadwall Securities, Inc., Arnold Mahler, Jack Einiger and Alexander Lapidus.

Frisch & Goldfluss, New York City, for defendant Stanley Miller, Martin Mushkin, New York City, of counsel.

McLEAN, District Judge.

This is an action to enjoin alleged violations of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)), and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)), and Rule 10b–5 thereunder (17 CFR 240.10b–5). Plaintiff has moved for a preliminary injunction. The court held a hearing at which testimony was taken. Upon the basis of the evidence there introduced, and of statements in the moving affidavits not contradicted by defendants, the court finds the facts to be as follows:

Defendant Broadwall Securities, Inc. ("Broadwall") is a New York corporation with offices at 26 Broadway, New York, N. Y. It is engaged in buying and selling securities. Since November 3, 1962 it has been registered with the Securities and Exchange Commission as a broker and dealer in securities, pursuant to Section 15(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(b)).

Defendant Arnold Mahler ("Mahler") is president, secretary-treasurer and sole stockholder of Broadwall. Defendants Jack Einiger ("Einiger") and Alexander Lapidus ("Lapidus") are securities salesmen who have been employed by Broadwall since March 1963 and April 1964 respectively. Defendant Stanley Miller ("Miller") is a securities salesman who was employed by Broadwall from September 1963 to October 1964.

The security with which this action is concerned is the common stock of The Coast to Coast Company, Inc. ("Coast to Coast"), a Nevada corporation. Prior to October 1963 that company's office was in Boston, Massachusetts. In October 1963 a change in the management occurred. Philip Levy became its president, a position which he continued to occupy until September 1964. This is the period in which the sales of which plaintiff complains took place.

Levy is affiliated with Vogel's Dairy Products Co., which has its office at 145 Reade Street, New York. When he became president of Coast to Coast, that company purported to make its office in the Vogel's Dairy office at 145 Reade

Street. In fact, Coast to Coast paid no rent. It had no employees on its payroll. As a practical matter, Levy, in the Vogel's Dairy office, carried on, on behalf of Coast to Coast, whatever business that company did.

The business of Coast to Coast is the distribution of packaged frozen lobsters. It purchases these lobsters from a Canadian corporation known as Sea 'n Surf, Ltd. ("Sea 'n Surf") located in Nova Scotia. Sea 'n Surf catches or breeds the lobsters, keeps them for a while in lobster pounds, then treats them, freezes them, packages them and sells them. Coast to Coast and Sea 'n Surf are wholly separate and independent companies. The only relation between them is that of buyer and seller. Coast to Coast has no exclusive arrangement with Sea 'n Surf for the marketing of its lobsters and no long-term contract with it. It merely buys lobsters from it from time to time.

Coast to Coast owns no lobster pounds. It owns no freezing process. It has no capital assets of any kind. It is merely a distributor.

According to an unaudited financial statement for the fiscal year ending October 31, 1963, Coast to Coast in that year made gross sales of frozen lobsters in the amount of $76,148.99. It had a gross profit of $19,994.62 and a net profit, after administration, general and selling expenses of $1,488.34 before taxes. As of October 31, 1963, it had assets having a book value of $25,671.78, including cash of $2,756.03 and accounts receivable of $12,879.34. It had current liabilities of $11,683.44. For the purposes of this motion, the court will assume that these figures are accurate.

For a time after Levy took over as president of Coast to Coast, the company did very little business. During the first four months of 1964 its gross sales were approximately $1,500. For the entire period from October 1963 to September 1964, its gross sales were approximately $30,000. Its net income for that period was approximately $2,000 before taxes.

During this period Coast to Coast had no term contracts with any customers for the purchase of lobsters. It sold them as best it could on an individual order basis. There is no evidence that it sold any lobsters to chain stores in 1964. It sold none to Howard Johnson's restaurants.

Coast to Coast has 4,000,000 shares of common stock outstanding. Of these, 700,000 shares were "given" to Levy by Mandel who was president of the corporation prior to October 1963. Levy paid nothing for them. He testified that he "turned them over" to Vogel's Dairy.

Although it is not entirely clear who originally owned the balance of this stock, it is apparent that one J. W. Kaufman owned a substantial quantity. Kaufman is in the securities business. He loaned money to the corporation when Levy became president, but he did not become an officer of it at that time. When Levy resigned as president in September 1964, Kaufman succeeded him.

On the basis of 4,000,000 shares of stock outstanding, the company's earnings of $2,000 before taxes for the period from October 1963 to September 1964 amounts to one-twentieth of a cent per share.

Between March 26, 1964 and July 20, 1964, Broadwall sold approximately 96,000 shares of Coast to Coast stock to various members of the public at prices ranging from 25¢ to 40¢ per share. Broadwall acted as principal in these transactions and sold the stock for its own account. Its source of supply of the stock was primarily Kaufman, although on a few occasions it purchased some from another broker. Broadwall paid prices ranging from 7½¢ to 40¢ per share for the stock it purchased.

On July 20, 1964, defendants Mahler, Einiger, Lapidus and Miller testified at the New York Regional Office of the Securities and Exchange Commission as witnesses in an investigation of dealings in Coast to Coast stock which the Commission was then making pursuant to an order of the Commission dated June 8, 1964. For approximately two weeks thereafter Broadwall ceased selling Coast

to Coast stock. It then resumed doing so and up to October 28, 1964 it sold approximately 20,000 additional shares of Coast to Coast to the public at prices ranging from 25¢ to 40¢ per share.

These sales were made primarily by telephone. Salesmen in Broadwall's office telephoned prospective buyers and suggested that it would be advantageous to them to purchase Coast to Coast stock. Confirmations of the sales were sent, and the securities were delivered, by mail. There is no doubt that in the sale of the stock defendants made use of the mails and of the means and instruments of transportation and communication in interstate commerce.

Mahler obtained from Kaufman a copy of Coast to Coast's balance sheet and earnings statement as of October 31, 1963, and a "data sheet" dated July 15, 1963 which set forth certain information as to the procedures employed by Sea 'n Surf in treating and freezing lobsters. Upon the basis of this data, Mahler prepared and delivered to Broadwall's salesmen in May 1964 a "Memorandum for Employees of Broadwall Securities, Inc., Only." This memorandum stated at the top:

> "This is a confidential memorandum. It is for your own use only, and must not under any circumstance be shown to customers or prospective purchasers."

There is no evidence to show that any statement in this memorandum was literally untrue, although the remark that, "Because of its need for capital to finance its rapidly expanding business, the Coast to Coast Corp. will follow the policy of retaining earning and of not paying any dividends," may be thought to be disingenuous, under the circumstances.

Mahler testified that he instructed Broadwall salesmen to make no statements to prospective customers which were not contained in this memorandum. Einiger testified that he made it a practice to read this memorandum to prospective customers in his telephone conversations with them. Lapidus testified that although he did not read the memorandum verbatim to prospective customers, he told them nothing that was not contained in the memorandum. Miller did not testify.

Plaintiff submitted affidavits of several customers which recounted their telephone conversations with Einiger or Lapidus or Miller concerning Coast to Coast stock. Eight customers testified at the hearing. For the purposes of this motion, the court will consider only the oral testimony of customers given at the hearing. They testified to a number of statements made to them by Einiger or Lapidus or Miller as to matters which obviously were not in Mahler's memorandum. The court accepts the testimony of these witnesses as being the more credible version of what occurred in these conversations.

Michael A. DeMarco, a real estate assessor residing in Brooklyn, New York, testified that in August 1964 Einiger telephoned him and told him that Coast to Coast owned "ponds" in which lobsters were frozen. Einiger said that Coast to Coast could obtain contracts for its lobsters with chain stores. On Einiger's recommendation, DeMarco purchased 400 shares at 25¢ per share.

Later in August 1964, Einiger telephoned him again. He said that the stock had gone up from 25¢ to 40¢ and urged DeMarco to get on the bandwagon. Einiger again said that Coast to Coast could obtain chain store contracts. He said that the value of the stock should rise to $5.00 per share in four to five years. As a result of this conversation, DeMarco purchased an additional 600 shares at 40¢ per share.

Herbert D. Tobias is a letter carrier employed by the United States Post Office Department. In September 1964 he went to Broadwall's office to deliver mail. While there he inquired what Einiger thought about Chrysler stock. Einiger said that he had another stock which in his opinion would do well, namely, Coast to Coast. Einiger said that Coast to Coast breeds, freezes and packages lobsters and sells them to chain

stores. In proof of this statement, he showed Tobias a photostatic copy of an invoice from Coast to Coast to the Great Atlantic & Pacific Tea Company, Inc. This invoice is dated August 14, 1963. There is no evidence that Coast to Coast ever made any other sale to this company or that it made any sales to any chain stores in 1964. Tobias purchased 100 shares of Coast to Coast for $30 which he paid in cash.

John DiBartolo is a retired employee of the New York Department of Sanitation. In March 1964 Lapidus telephoned him and suggested that he buy Coast to Coast stock. Lapidus said that Coast to Coast was in the business of canning shell food and that it had a patent which would eliminate ptomaine poisoning. He said that Coast to Coast offered a good opportunity to make money in the near future. He said that an investment in this stock would increase four or five times in six to eight months. DiBartolo bought 1,000 shares at 37½¢ per share.

A few weeks later Lapidus telephoned again. He told DiBartolo that there was a big demand for Coast to Coast's product on the part of Howard Johnson's, the Brass Rail and several other big restaurants. He said that the demand was so great that Coast to Coast could not produce lobsters fast enough and needed to expand its plant. Lapidus told DiBartolo that he was his friend, he asked him to call him "Ally." He said, "I am going to see you get some real good money fast." He assured DiBartolo that within a year he would have a good income. He said that he could give DiBartolo the opportunity to buy Coast to Coast stock at 40¢ a share although it was worth more than that, around 60¢ to 75¢ a share. DiBartolo bought another 1,000 shares at 40¢ a share.

York Iguchi is an attorney residing in Huntington Station, Long Island. In September 1964 Lapidus telephoned him and recommended that he buy Coast to Coast stock. He said that Coast to Coast had acquired a new process by which lobsters were homogenized. He said that because of this new process the financial prospects of the company were good. He said in his opinion the stock might increase in value to $2.00 or $2.50 per share in about six months. Iguchi purchased 500 shares at 30¢ per share. Subsequently, in October 1964, Iguchi informed Lapidus that he, Iguchi, had been interrogated by the Securities and Exchange Commission. Lapidus then said that Iguchi might cancel the purchase if he desired. Iguchi availed himself of this offer and cancelled it.

Bernard Fogelman is an electronics technician residing in Arverne, New York. In August 1964 Lapidus telephoned him and said that he had a low priced stock, Coast to Coast, which he was very sure would increase in price in a short time, that looked good. Fogelman bought 500 shares at 35¢ per share.

Robert H. Levine is a dentist who resides in Springfield, New Jersey. He is an experienced trader in low priced securities. In April 1964 Miller telephoned him and recommended the purchase of Coast to Coast stock. Miller said that Coast to Coast had a freezing process and large contracts with supermarkets. He said that the group which had "pushed up" the price of an oil stock which Levine owned might well push up Coast to Coast also. Dr. Levine purchased 1,000 shares at 40¢ per share.

June C. Springer lives in Williamsport, Pennsylvania. She is an accountant and is also in the building contracting business. Apparently she also has bought and sold stocks frequently over a period of years.

In April 1964 Miller telephoned her and recommended Coast to Coast stock. He said that Coast to Coast had developed a new method of processing lobsters which had been tested favorably in chain stores and that it was negotiating with a supermarket chain to put the lobsters on sale on a national basis. Mrs. Springer asked him for "literature" about the company. He said there was none available. Miller further stated that Coast to Coast would probably sign a contract with a supermarket in about a month and that the stock would then go up. He

said that there was a lot of activity in the stock because of this pending contract. Mrs. Springer bought 500 shares at 37½¢ per share.

A short time thereafter Miller telephoned Mrs. Springer again and asked her to buy some more Coast to Coast stock. She did not do so.

Frank V. Castelli is a tool planner residing in Bethpage, New York. In April 1964 Miller telephoned him and recommended that he sell some stock in another company which Miller had sold to him on a previous occasion and buy Coast to Coast instead because Coast to Coast would move faster. Miller said that Coast to Coast had a new process for freezing lobsters and that they would be distributed through supermarkets. He said that the company's earnings were 23¢ per share. Castelli bought 500 shares at 40¢ per share.

In none of these instances did the Broadwall salesmen inform potential customers that Coast to Coast had 4,000,000 shares of common stock outstanding. In no case, with the exception of Miller's conversation with Castelli, did the salesman inform the customer what Coast to Coast's earnings were or what its debts were. In the Castelli case, as above noted, Miller did mention the subject of earnings and grossly exaggerated them.

With the exception of Tobias, the letter carrier, none of the purchasers impressed the court as being wholly naive and inexperienced. Dr. Levine and Mrs. Springer were inveterate purchasers of this type of security. Castelli also had bought "quite a few stocks" over the years. Others testified that they realized that Coast to Coast was "speculative" and that statements as to what its market price would be in the future were statements of "opinion."

■ Section 20(b) of the Securities Act of 1933 (15 U.S.C. § 77t(b)), and Section 21(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78u(e)) each provide that "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation" of the Act or of any rule or regulation thereunder, it may apply to the district court to enjoin such acts or practices and "upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." Under these statutes plaintiff, in order to make a "proper showing," need not prove that irreparable injury will result unless a preliminary injunction is granted. Securities and Exchange Commission v. General Securities Company, Incorporated, 216 F.Supp. 350 (S.D.N.Y.1963)

■ Moreover, the court, upon a motion for a preliminary injunction, is not called upon finally to decide the merits of the controversy. It is necessary only that the court find that plaintiff has presented a "strong prima facie case to justify the discretionary issuance of the interlocutory 'restraint." Securities and Exchange Commission v. Boren, 283 F.2d 312 (2d Cir. 1960)

In deciding whether to issue an injunction, "[t]he critical question for the court * * * is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby." Securities and Exchange Commission v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959)

■ The adverse effect of an injunction upon defendants is, of course, a factor to be considered, but "the public interest, when in conflict with private interest, is paramount." Securities and Exchange Commission v. Culpepper, supra at 250

■ In the court's opinion plaintiff has made a sufficiently strong prima facie showing here. The court can see no legitimate reason for Coast to Coast to issue 4,000,000 shares of common stock. The inference is irresistible that the sale of frozen lobsters was secondary in importance to the sale of stock.

■ Einiger, Lapidus and Miller in their conversations with potential customers, each made affirmative misstate-

ments of material facts of varying degrees of enormity, for example, among others, that Coast to Coast owned lobster "ponds," that Coast to Coast breeds, freezes and packages lobsters, that Coast to Coast sold lobsters to chain stores in 1964, that Coast to Coast was in the business of canning shell food and that it had a patent which would eliminate ptomaine poisoning, that there was a big demand for Coast to Coast products on the part of Howard Johnson's, etc., that Coast to Coast had acquired a new process by which lobsters were homogenized, that Coast to Coast had large contracts with supermarkets, that Coast to Coast had earnings of 23¢ per share. These salesmen had no reason to believe that these statements were true. On the contrary, they must have realized that they were not true. In inducing potential customers to rely upon them, they violated the Acts. Berko .v. Securities and Exchange Commission, 316 F.2d 137 (2d Cir. 1963)

■ It is argued that the salesmen's statements as to future market prices of the stock were mere predictions and opinions, and that the customers recognized them to be such. In a sense this is true. But these opinions were uttered for the purpose of influencing customers to buy Coast to Coast stock. They did, in fact, influence the customers to buy it. They were not voiced in good faith. The salesmen knew, or should have known, that there was no basis in fact for such optimistic representations. Nothing contained in the memorandum given to them by Mahler justified such a view of the company's future prospects. There is no evidence that they were advised in any other fashion of any factual basis for such a view. Under these circumstances, the voicing of such "opinions" was also a violation of the Act. Securities and Exchange Commission v. Rapp, 304 F.2d 786 (2d Cir. 1962), Berko v. Securities and Exchange Commission, supra, Securities and Exchange Commission v. F. S. Johns & Co., 207 F.Supp. 566 (D.N.J. 1962).

■ Taken in connection with these affirmative misrepresentations, and under all the circumstances revealed by the evidence here, these salesmen also violated the Acts by failing to disclose material facts, i. e., the huge amount of Coast to Coast stock outstanding and its miniscule earnings.

■ As far as Mahler is concerned, he supervised the salesmen and directed their activities. He was, indeed, the head of the entire enterprise. The court has had the opportunity to hear his testimony and see him on the witness stand. The court believes, and so finds, that he knew what his salesmen were saying to potential customers and that he authorized their statements. It follows that he also violated the Acts. Securities and Exchange Commission v. Rapp, supra.

■ Defendants urged that a preliminary injunction should not issue because they have discontinued the practices complained of. Mahler testified that, with one exception, to accommodate a customer in making a "tax sale" in December 1964, Broadwall stopped selling Coast to Coast stock at the end of October 1964. Miller left Broadwall's employ in October. He stated in his affidavit that he is "seeking" employment "outside the securities business," that he does not "intend" to reengage in the securities business.

The court sees no merit in this contention. It is obvious that Broadwall's decision to stop selling Coast to Coast stock came only after the Commission had begun its investigation. Indeed, even the beginning of the investigation and the subpoenaing of defendants to testify in July 1964 was not enough to bring about the decision to discontinue. After a lull of two weeks, their activities were resumed and carried on for several months more.

■ The law is clear that cessation of the violations under these circumstances does not deprive the court of power to grant a preliminary injunction. Securities and Exchange Commission v. Culpepper, supra, Securities and Exchange Commission v. Boren, supra, Securities and Exchange Commission v. General Securities Company supra, Se-

curities and Exchange Commission v. Bennett & Company, 207 F.Supp. 919 (D.N.J.1962).

The test is whether defendants' "past behavior gives indication that without injunctive measures they might again engage in such activities." Securities and Exchange Commission v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959).

In the court's opinion there is danger of recurrence here. The public is entitled to protection against that danger.

As to Miller, the evidence against him is strong. His misrepresentations were flagrant. His protestations of a lack of present "intent" to reengage in the securities business are less than convincing. See Securities and Exchange Commission v. Kamen & Company, 241 F.Supp. 430 (S.D.N.Y.August 30, 1963).

The court has considered whether an exception should be made in his case. The court is satisfied that it should not.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The motion is granted.

Settle order on notice.