**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**LAKE HAVASU ESTATES, an Arizona corporation, Defendant.**

**Civ. A. No. 4–71 Civ. 512.**

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 11, 1972.

---

Donald Dreyfus, S.E.C., Chicago, for plaintiff; Robert G. Renner, U. S. Atty., Minneapolis, of counsel.

William Mullin, Mullin, Galinson, Swienoff and Weinberg, Minneapolis, Sheldon Green, Green & Green, Phoenix, Arizona, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

LARSON, District Judge.

[Editor's Note: At the request of the Hon. Earl R. Larson, Findings of Fact and Conclusions of Law Nos. 1–21 and 36–50 are omitted.]

### CONCLUSIONS OF LAW

*Jurisdictional Matters*

22. This action arises under the Securities Act of 1933 (the "Act").[8] The Commission is authorized to bring this action by Section 20(b) of the Act,[9] and this Court has jurisdiction over the action pursuant to Section 22(a) of the Act.[10]

*Registration Provisions of the Securities Act*

23. Section 5 of the Act[11] provides in pertinent part:

Sec. 5(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

8. 15 U.S.C. § 77a et seq.
9. 15 U.S.C. § 77t(b).
10. 15 U.S.C. § 77v(a).
11. 15 U.S.C. § 77e.

\* \* \* \* \* \*

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8.

*Interpretation of Term "Security"*

24. Section 2(1) of the Act defines the term "security" as follows:

the term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

 25. Because the investors, normally, rely solely on Lake Havasu for selection of the land (from which the investor is separated by great distance), selection of the land purchaser (whose credit standing is not investigated), selection of the specific contract to be sold to the investor, collection agent services, guarantee of monthly payments, guarantee of replacement of any land purchase agreement which is defaulted, and arrangements for transfers and recordings among Lake Havasu, the land purchaser and the investor, the contracts distributed by Lake Havasu are "investment contracts" and hence securities within the statutory definition. As stated in Securities and Exchange Commission v. Howey, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1002 (1946):

. . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. . . . [12]

See also Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Similarly, the sale of promissory notes secured by a mortgage on real property, with services comparable to those here involved, has been held to constitute an investment contract. Los Angeles Trust Deed & Mortgage Exchange v. Securities and Exchange Commission, 285 F.2d 162 (C.A.9), certiorari denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961).[13]

12. Howey offered investors small parcels of citrus acreage under a land sales contract, with an optional service contract for the cultivation, harvest and sale of the produce from the acreage.

13. The *Los Angeles Trust Deed* case involved a purchase of a promissory note from a company which, in turn, selected for its own purchase and acted as collection agent for trust deed notes, with a promised 10% annual rate of return on the purchase amount of the interest. As the court stated (285 F.2d at 172), investors were

'led to expect' the promised 10% earnings solely on the basis of the continued ability of LATD to select, screen, appraise and acquire suitable trust deed notes, to service and collect the loan, and, if necessary, to handle foreclosure thereof, and if required by the investor, to repurchase or arrange for the resale of the obligation.

These cases are in accord with the Commission's long-standing interpretation that activities of the type involved in the present case are subject to the registration provisions of the Securities Act. *See* Securities Act Rel. No. 3892 and Securities Exchange Act Rel. No. 5633 (January 31, 1958); Public Offerings of Investment Contracts Providing for the Acquisition, Sale or Servicing of Mortgages or Deeds of Trust, S.E.C. Litigation Rel. No. 1876 (January 9, 1961).

■ 26. By virtue of the aforedescribed dependence of investors on Lake Havasu, it is clear that these investors are joined with Lake Havasu in a "common enterprise," Securities and Exchange Commission v. Howey, *supra,* 328 U.S. at 299, 66 S.Ct. 1100, and that it is the commitments and anticipated efforts of Lake Havasu on behalf of these investors which give the notes and mortgages sold "most of their value and all of their lure." Securities and Exchange Commission v. C. M. Joiner Leasing Corp., *supra,* 320 U.S. at 349, 64 S.Ct. 120, 88 L.Ed. 88. The ability of Lake Havasu to make good its commitments to these investors is indeed "the thread on which everybody's beads [are]

strung." Securities and Exchange Commission v. C. M. Joiner Leasing Corp., *supra,* 320 U.S. at 348, 64 S.Ct. at 122. The economic welfare of the investor is inextricably interwoven with the financial prospects of Lake Havasu and the continuing ability of that company to stand behind its endorsement of the land purchaser's Agreement and Note. *See,* Los Angeles Trust Deed & Mortgage Exchange v. Securities and Exchange Commission, *supra,* 285 F.2d at 172.[14]

■ 27. Lake Havasu has asked that consideration be given to several additional factors not heretofore discussed in resolving the "security" issue. Included among these are (1) the land sale transaction which generates the note which is sold by Lake Havasu to investors is subject to regulation by the department of Housing and Urban Development under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 et seq.; and (2) the rate of return to the investor is fixed by contract and is not subject to increase or decrease depending upon the profitability of Lake Havasu's operations. As to the first, such regulation is directed essentially towards protection of the land buyer, not the investor who subsequently purchases

While Lake Havasu asserts that its program, unlike that involved in the *Los Angeles Trust Deed* case, does not involve a program of continuing reinvestment of the funds of its investors, this constitutes only one factor to be considered in determining the existence of a security, and in the totality of circumstances here present, the Court is constrained to conclude that Lake Havasu's activities have created a security relationship with its investors. And the fact that the initial land purchase which underlies the investment contract has taken place prior to the execution of the investment contract—a factor which Lake Havasu urges as a basis for distinguishing *Los Angeles Trust Deed*—is wholly without relevance.

14. The president of Lake Havasu testified that it was the general opinion in this industry, in which he concurred, that the investment sales activities of Lake Havasu did not require registration with the Commission under the Securities Act. He further testified that the unanimous advice of the three attorneys retained by Lake Havasu since its incorporation had been that such registration was not required. Such opinions are of course immaterial to the question whether, as a matter of law, the contracts sold by Lake Havasu constitute securities. The court would note in passing, however, that it is somewhat puzzled as to how this erroneous view could persist on such an assertedly widespread basis, considering court opinions and Commission public releases in this area, and the communications to Lake Havasu by members of the Commission's staff. Moreover, the Court is of the view that for reasons stated more fully beginning at No. 29, *infra,* the evidence concerning the prevailing industry custom and the reliance by Lake Havasu on opinions of counsel must have no bearing on the determination whether a preliminary injunction should issue in the present case.

his note; moreover, Lake Havasu has not demonstrated what if any bearing the existence of even an overlapping statute would have in determining whether a company's activities are subject to the registration provisions of the Securities Act. Regarding the second factor, while the rate of return may be fixed (as with many "bonds," "debentures" or promissory "notes," all of which are expressly included in the statutory definition of a security (see No. 24, *supra*)),[15] the probability that an investor will receive that rate of return and recover his principal is clearly dependent upon the success or failure of Lake Havasu's operations.[16]

28. Since in or about November 1969 to the present, Lake Havasu, in the District of Minnesota, and elsewhere, has been and is now, directly and indirectly (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell and offer to sell the investment contracts described above to public investors, through the use and medium of prospectuses and otherwise; and (b) carrying such contracts and causing them to be carried through the mails and in interstate commerce by means and instruments of transportation, for the purpose of sale and for delivery after sale, all without registration as required by Section 5 of the Act.

*Considerations Bearing on Issuance of Injunction*

29. By motion filed with its complaint, the Commission has requested that this Court issue a preliminary injunction prohibiting Lake Havasu from further violations of Section 5 of the Securities Act with respect to the investment contracts it is presently distributing or any other security. The statute which authorized the Commission to institute this action, Section 20 (b) of the Act, provides in pertinent part:

> whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this sub-chapter . . . it may in its discretion, bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

The issue joined at this point involves the "proper showing" for injunctive relief.

Lake Havasu contends that to support injunctive relief, at least of a preliminary nature, the Commission must allege and prove, among other things, that without injunctive relief there would be irreparable harm to the Commission or the investing public which it seeks to protect, and that, on balance, the harm flowing to the investing public absent an injunction would exceed the hardship caused to Lake Havasu by the issuance thereof.[17] The Commission, on the other hand, argues that demonstration of

---

15. Similarly, in the *Los Angeles Trust Deed* case, *supra*, there was a fixed rate obligation.

16. The president of Lake Havasu testified that although the financial background of the land purchaser is not investigated, the company, subsequent to each sale of land, contacts the purchaser in order to confirm his intention to fulfill his land-purchase contract. While this practice may bear on the value of the land-purchase contract, in the context of the present case it merely shows additional services performed by Lake Havasu on behalf of the investors who purchase the note which the land-purchaser gives to Lake Havasu, and thus represents a further element demonstrating the existence of an investment relationship between Lake Havasu and such investors.

17. Lake Havasu relies principally in this regard on Securities and Exchange Commission v. Frank, 388 F.2d 486 (C.A.2, 1968); Securities and Exchange Commission v. Arco Industries, Inc., CCH Fed. Sec.L.Rep. ¶ 92,921, p. 90,406 (S.D.N.Y., January 18, 1971); and Securities and Exchange Commission v. Harwyn Industries Corp., 326 F.Supp. 943 (S.D.N.Y., 1971).

a statutory violation alone may be the basis for an assumption that such violation likely will continue unless injunctive relief is granted.[18] The violation thus establishes a *prima facie* case for the issuance of a preliminary injunction. Irreparable injury is not required for a statutory injunction.[19] Stated somewhat differently, separate specific consideration need not be given to questions of "irreparable harm," since future violations are deemed to cause irreparable harm to the public interest protected by the statute. In any event, "irreparable harm" to the investing public and the paramountcy of that harm over private hardship is to be presumed from a satisfactory showing of a serious and widespread violation of Section 5 of the Securities Act, unless there is good reason to believe that such violation will not be repeated.

◼ 30. In the context of the present action, the apparent divergency of the parties' views is more imaginary than real. Certainly, consideration must be accorded, in determining a motion of the instant type, to the imminence of harm to the investing public absent issuance of a preliminary injunction; indeed, the prime consideration in a case of this type is the public interest.[20]

◼ 31. In this regard, the importance of Section 5 of the Securities Act cannot be minimized. Congressional committees that considered the bill which became the Securities Act emphasized that the protection accorded to investors by this provision is the fundamental feature of the Securities Act.[21] As the Supreme Court has stated, "The essential purpose of the statute is to protect investors by requiring publication of certain information concerning securities before offered for sale." Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500 (1941); *accord* Securities and Exchange Commission v. Guild Films Co., 279 F.2d 485 (C.A.2), certiorari denied sub nom. Santa Monica Bk. v. Securities and Exchange Commission, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960); Gilligan, Will & Co. v. Securities and Exchange Commission, 267 F.2d 461, 463 (C.A.2), cer-

18. Tanzer v. Huffines, 408 F.2d 42, 43 n. 1 (C.A.3, 1969); Securities and Exchange Commission v. Keller Corp., 323 F.2d 397, 402 (C.A.7, 1963); Los Angeles Trust Deed & Mortgage Exchange v. Securities and Exchange Commission, *supra*, 285 F.2d at 180–181; Securities and Exchange Commission v. Culpepper, 270 F.2d 241, 249–250 (C.A.2, 1959).

19. Securities and Exchange Commission v. Culpepper, *supra*, 270 F.2d at 249; Securities and Exchange Commission v. Torr, 87 F.2d 446, 450 (C.A.2, 1937); Securities and Exchange Commission v. Liberty Petroleum Corp., CCH Fed.Sec. L.Rep. ¶ 93,209, p. 91,347 (September 2, 1971); Securities and Exchange Commission v. Shattuck Denn Mining Corp., 297 F.Supp. 470, 472 (S.D.N.Y., 1968); Securities and Exchange Commission v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248, 261 (D.Utah, 1958); see Shafer v. United States, 229 F.2d 124, 128 (C.A.4), certiorari denied, 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956); Shadid v. Fleming, 160 F.2d 752, 753 (C.A.10, 1947); American Fruit Growers, Inc. v. United States, 105 F.2d 722, 725 (C.A.9, 1939).

20. Securities and Exchange Commission v. Culpepper, 270 F.2d at 250; Securities and Exchange Commission v. Broadwall Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y., 1965); see Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944); cf. Associated Securities Corp. v. Securities and Exchange Commission, 283 F.2d 773 (C.A.10, 1960); Hamlin Testing Labs v. United States Atomic Energy Commission, 337 F.2d 221 (C.A.6, 1964); Eastern Air Lines, Inc. v. Civil Aeronautics Board, 261 F.2d 830 (C.A.2, 1958); Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 921 (C.A.D.C., 1958).

21. Report of Comm. on Banking and Currency, S.Rep. No. 47, 73d Cong., 1st Sess. (1933), p. 1; Report of Comm. on Interstate and Foreign Commerce, H.R.Rep. No. 85, 73d Cong., 1st Sess. (1933), pp. 6–7. Also see President Roosevelt's Transmittal Message of March 29, 1933, House Doc. No. 12, 73d Cong., 1st Sess. (also contained at pp. 6–7 of the Senate Committee's report).

tiorari denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

32. This Court concludes that sale by Lake Havasu to public investors in approximately a two-year period of $3,500,000 worth of investment contracts, absent the protection accorded to such investors of dissemination to them of a statutory prospectus prior to their agreement to purchase such contracts, is evidence of the likelihood that similar sales will continue unless enjoined, all to the irreparable harm of the investing public. As the court recently stated in a case cited by Lake Havasu in the present action, Securities and Exchange Commission v. Century Investment Transfer Corp., CCH Fed.Sec.L.Rep. ¶ 93,232, p. 91,442 (S.D.N.Y., October 5, 1971): "Irreparable harm will be done to purchasers of the unregistered shares, since they will not be protected by the disclosure that results from registration."

33. Cessation of financially successful business activities occasions loss to the principals of that business, and the Court takes note of evidence adduced in behalf of Lake Havasu which tends to show that Lake Havasu's operations support a substantial payroll and that the company, through taxes, contributes to various governments.[22] But while the Court has given consideration to the hardship which an injunction may cause to Lake Havasu's management and personnel, the extent of such hardship is clearly outweighed in the present case by the harm which can be expected to flow to the investing public—including potential purchasers of the securities which Lake Havasu desires to distribute —if Lake Havasu is permitted to continue its unlawful activities.

34. In addition to Lake Havasu's conduct to date, its intentions as indicated by the testimony of its president make apparent that there exists a substantial likelihood that violation by Lake Havasu of the registration provisions of the Securities Act will continue unless judicially restrained. Such violations, which began about November 1969, have continued without interruption to date, notwithstanding several strong warnings to Lake Havasu from various members of the Commission's staff. The ongoing nature of these violations is itself a sufficient basis for distinguishing the case authorities chiefly relied upon by Lake Havasu in support of its argument that an injunction should not issue in the present case.[23]

35. Finally, this Court concludes that there is a substantial probability that the Commission will prevail on its complaint after a full trial on the merits, notwithstanding Lake Havasu's contention that the case will in effect be moot at that time because its registration statement, as amended, which it has previously filed with the Commission, will have become effective. Initially, it must be observed that Lake Havasu's contention is somewhat wide of the mark on the present motion: injunctive relief is necessary in this Court's view, at the very least, *until* such registration statement does become effective. Moreover, there can, of course, be no assurance as to when, or whether, Lake Havasu's registration statement will become effective. However, even if such registration statement has become effective prior to final judgment in this action, that registration statement covers only a single offering of securities, and any further offerings will necessitate new registration statements. Given Lake

---

22. In this regard, Lake Havasu presented evidence which indicated that its business reputation was good, that it employed 76 administrative personnel and utilized a substantial selling force, and that it had numerous commitments—upon none of which had it ever defaulted—to other companies and governmental taxing bodies, as well as to the numerous investors who have purchased the notes and mortgages which it has sold. Lake Havasu's evidence further tended to show that if the requested injunction were to issue, it could stay in business for no more than 30 to 60 days.

23. See note 17, *supra*.

**1326**

Havasu's prior conduct, it does not appear unlikely that Lake Havasu may in the future repeat unlawful activities of the type involved in the present action.